**The Columbian Circle, Interpleader, v. Anna Mudra et al., on appeal of Joseph J. Kroupa, Appellant. Anna Mudra, Appellee.**

**Gen. No. 25,455.**

1. INSURANCE, § 822*—*what are rights of beneficiary.* A beneficiary has no vested rights in an insurance certificate issued by a fraternal society merely because he has been designated as a beneficiary.

2. INSURANCE, § 822*—*when beneficiary has equitable rights.* A member of ·a fraternal organization may make a contract with a beneficiary whereby he so binds himself that in equity he will be unable thereafter to take away certain established equities of that beneficiary, and whether or not he has taken away the beneficiary's rights will depend upon what the evidence shows as to the conduct of both the insured and the beneficiary.

3. INSURANCE, § 826*—*when beneficiary cannot be changed.* Where a death benefit certificate, payable to a wife, was both taken out and given to her with the understanding between husband and wife and in the family that it was to belong to the wife and that she was to pay or cause to be paid the premiums, and substantially all premiums were paid by the wife or by her sons on her behalf for a period of 16 years, she had such an equity and vested interest in the insurance represented by the certificate that the husband was not entitled, without her consent, to change the beneficiary, and therefore a second certificate attempting to effect such change was void.

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

*o*

Appeal from the Superior Court of Cook county; the Hon. Denis E. Sullivan, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1919. Affirmed. Opinion filed December 22, 1920. Rehearing denied January 6, 1921.

Joseph Z. Klenha and Edward J. Smejkal, for appellant.

Lighthall, Dankowski & Carlson, for appellee.

Mr. Presiding Justice Taylor delivered the opinion of the court.

On March 24, 1899, one James Mudra (now deceased), a member of the order of the Columbian Knights, received a benefit certificate on his life in the sum of $1,000, in which his wife, Anna Mudra, was named as beneficiary. Subsequently, the title of the insurer, the complainant, was charged to that of The Columbian Circle. On March 13, 1916, James Mudra applied, in writing, for a change in his benefit certificate. In his written application he set forth that he had lost his original certificate and requested that a duplicate certificate be issued and that the beneficiaries and the benefits thereof should be as follows: "To my wife, Anna Mudra, $5.00. My son Rudolph Mudra, $10.00. My son, Eddie Mudra, $10.00, and my nephew, Joseph J. Kroupa, $775.00. John Mudra, related to me as brother, $100.00; Marie Mudra, sister, $100.00." Pursuant to that application the complainant on March 20, 1916, issued a new or duplicate benefit certificate to James Mudra for the sum of $1,000, naming as beneficiaries and the amounts of their benefits all as set forth in Mudra's application. On June 29, 1917, James Mudra died and the question arises, who are the proper beneficiaries and how must the $1,000 be distributed. The complainant, the Columbian Circle, filed a bill of interpleader in which it is admitted that $1,000 is due, and asked the court to

determine the proper beneficiaries and how the money should be distributed.   Various answers and replications were filed and the cause was referred to a master in chancery who took the evidence and reported that the issuance of the second certificate, that of March 20, 1916, canceled the original certificate, and that the beneficiaries named in the certificate of March 20, 1916, were entitled to receive the proceeds and in the proportions therein set forth.   Subsequently the master's report and the exceptions thereto were considered by the chancellor and a decree entered finding that the benefit certificate dated March 20, 1916, was null and void, and that the original certificate of March 31, 1899, was in full force and effect, and that the defendant, Anna Mudra, by virtue thereof, was entitled to receive from the complainant the whole of the $1,000 mentioned in the original benefit certificate.   A decree was entered in accordance therewith, and this appeal is therefrom.

It is contended by the defendant, Joseph J. Kroupa, that the beneficiaries under the second certificate, that of March 20, 1916, were the only ones entitled thereto, and that the evidence failed to show that Anna Mudra had any existing equity which justified holding that the first certificate was still outstanding.

The substantial question in the case pertains to the equities of Anna Mudra; whether or not, by reason of certain conduct on the part of her husband and the payment of premiums by her or for her by her sons, she acquired such rights under the first certificate that her husband had no legal right to change the beneficiary as named in the original certificate.

The master, before whom the witnesses appeared when the evidence was taken, found against the equities of Anna Mudra and upheld the second certificate. On the other hand the chancellor, who did not see the witnesses, found in her favor.

James Mudra and Anna Mudra came from Austria

over 40 years ago. They were married when Anna Mudra was 18 years of age. At the time of the trial she was 60. They had some money when they were married and after coming to Chicago they bought a piece of property in the vicinity of 17th and Laflin streets which they owned for a number of years. That property they sold in 1908 and the family then moved to the State of Nebraska. The oldest son, however, remained in Chicago. At the time of the sale of that property the proceeds were divided equally between the husband and wife, each receiving about $1,100. There were four children, James, Bohumil, Rudolph and Edward, the eldest of whom, James Mudra, was at the time of the trial 38 years of age and the youngest about 26. The evidence pertaining to the issuance of the two certificates and whatever arrangements were made between the husband and wife concerning them or either of them and the payments of the premiums thereon is substantially as follows:

Anna Mudra testified that when her husband joined the lodge—which was in 1899—he gave her the certificate for safe-keeping and from that time on they (sic) had it hidden away; that she had it in her possession all the time. She testified, through her son James F. Mudra, as interpreter, and her evidence is very brief. She stated that the premiums were paid every month; that she paid the premiums and was careful that they were paid. When asked, did anybody pay those premiums for you? she answered, "No one paid them for me—he sometimes paid them himself." Upon being recalled, she stated that she did not mean that she went to the lodge and made the payments but that her sons went in her stead.

James F. Mudra, the son of the James Mudra (deceased) and of Anna Mudra, stated that when the certificate was first handed to his mother his father said: "Now mother, this is yours—you pay those premiums and you look after it that these premiums

are paid—I have not got the time to look after that and you keep track of it and see that these premiums are paid.'' That his mother took it and kept it and put it away; that either she or he has had it ever since; that subsequently his father's family moved out to Nebraska and he visited them; that his father on that occasion told his mother to be sure and see that the premiums were kept up; that he further said: ''I won't need that and that will be for your benefit after I am gone—be sure to take care of it and don't drop those premiums on this one—pay the premiums in this lodge.'' He further testified that during the 4 or 6 years that his parents were in Nebraska, before they returned to Chicago, he and his brother Bohumil attended to the payment of the premiums; that they paid them at their mother's request; that he, himself, continued to pay the premiums from 9 to 11 years after the certificate was issued and paid them at his mother's request; that his father may have paid them several times when he went to the meetings; that when he, the witness, paid the premiums he would get the money for that purpose from his mother; that while his parents were out in Nebraska he had charge of collecting the rents from some property in Chicago which belonged to his mother and his father and that he paid the lodge out of that. On cross-examination, he stated that the money that his mother gave' him to pay the premiums was money that she and their father had accumulated during their married life together with money which her sons turned over to her; that when he paid the premiums he nearly always got the money from his mother, although sometimes it happened on pay day and he paid it out of his own money and gave his mother the receipt and figured it in the same way as though it were her money; that he paid the premiums on his mother's behalf.

The son, Bohumil Mudra, 33 years of age, stated that he remembered when his father joined the Columbian

Knights in 1899; that on one occasion, just before his father and mother went to Nebraska, his father told him to take care of the premiums because that was all his mother would ultimately have when he died; that he personally has paid the premiums out of his own pocket on his mother's behalf; that within 3 years his father said that they could pay the premiums or let the policy lapse; that that was up to them; that he was not working and could not afford it; "if. we wanted to do it all right."

Rudolph Mudra, a son of the deceased and 28 years of age, testified that he went with his parents to Nebraska when he was 18 years old; that when the question came up about the insurance his father said: "Keep it up because, he says, I don't know—a person don't know what is liable to happen and you might as well keep it up so that the mother can have something in case I die"; that that statement was made to the family as they were sitting in the kitchen; that his mother said the premiums would be kept paid; that he, himself, made some payments for a few months on behalf of his mother; that he got the money from his mother; that he made four or five payments, some of which were for 2 months, after March 20, 1916.

Antonie Mraz, who testified through an interpreter, stated that she was a sister-in-law of the deceased and a sister of Anna Mudra; that James Mudra called at her house often during his lifetime; that since 1916 he called once a month or oftener and once told her to tell Anna Mudra to make payments of the premiums; that he was not employed and could not make them; that the certificate was in her name and if she wished to keep the certificate alive to make the payments; that he made that statement a number of times; that she saw Anna Mudra and told her about the matter.

One Vranek, secretary of one of the lodges of the Columbian Circle, stated that James Mudra, the de-

ceased, was a member of his lodge; that the application for change of beneficiary was signed by James Mudra in his presence; that he told him, the secretary, that his old certificate was not to be found and that he wanted to be covered and that he wanted to change the beneficiaries; that he was not living with his wife; that accordingly the second certificate was issued upon that application; that he knew James Mudra ever since he joined their lodge in 1915; that he has occasionally seen him at the lodge when he has attended and paid his dues; that when he could not attend the lodge he used to call at the house and pay up; that he had seen Rudolph Mudra pay his father's dues and that on several occasions he had inquired whether his father's dues were paid; that in a good many cases he had told him yes; that the sons came up to the house at different times and some of the dues were paid by them; that whenever the pass book was not presented he gave a receipt. On cross-examination he stated that he did not recall that Bohumil ever paid any dues and that James F. Mudra never did; that he had no recollection how many times Rudolph Mudra and Edward Mudra called after April, 1915, when James Mudra became a member of Tabor Lodge; that he met James Mudra at those meetings at his house and on the street; that he did not attend meetings as regularly as a good member should, but that he came over whenever his dues were to be paid; that the written portions in the applications which he signed on March 13, 1916, are in his, the witness' handwriting; that all the lodge members were present at the time it was prepared. On further cross-examination he stated that Edward and Rudolph Mudra came over from time to time to inquire about their father's dues; that in some cases they paid them but in most cases he told them that their father's dues or assessments were paid to a certain time, because their father was prompt in paying assessments.

Bohumil Mudra, recalled by the defendant, stated that he paid no premiums personally to Vranek.

The evidence further shows that during the last 4 years of his life James Mudra, the deceased, was in the habit of staying home a few weeks and then going away and coming back again; that immediately prior to his death he was away for a year without returning. There is also some evidence that he was in the habit of drinking a great deal and becoming intoxicated. During 1915 and 1916 he was employed as a street sweeper. He died on June 29, 1917, so that over a year and a half had elapsed between the application for a change of beneficiary and his death.

There is no doubt that it is the law that a beneficiary has no vested rights in an insurance certificate issued by a fraternal society merely because he has been designated as a beneficiary. *McGrew v. McGrew,* 190 Ill. 604. Just as there is no heir to the living *(nemo est hæres viventis)* so the right of the beneficiary, *qua beneficiary,* accrues only upon the death of the member. The certificate by itself is only evidence of the contract between the society and the member. But, it is the law, also, that a member of a fraternal organization may make a contract with a beneficiary whereby he so binds himself that in equity, at least, he may be unable thereafter to take away certain established equities of that beneficiary; and whether or not he has taken away the beneficiary's rights will depend practically entirely upon what the evidence shows as to the conduct of both the insured and the beneficiary. It was held in *McGrew v. Mc-Grew, supra,* that where a daughter who was named as beneficiary and advanced a sum of money almost equal to the face value of the certificate and held the certificate as security for her advances, the insured had no right to surrender the certificate and in lieu thereof have a new one issued and made payable to a third person.

In *Royal Arcanum v. Tracy,* 169 Ill. 123, where it was agreed by the husband and wife before the certificate was issued that the wife should advance her husband a certain sum of money and that she should then be the beneficiary and the certificate should be turned over to her when it was obtained and in accordance therewith she did advance her husband $1,500 and he turned over to her the certificate, the court held that as between husband and wife he had no right whatever to surrender the certificate and have the insurer make out a new one to a third person.

In *Women's Catholic Order of Foresters v. Hill,* 191 Ill. App. 629, where a mother made an agreement with her daughter that out of the proceeds of the certificate the daughter should see that $100 was paid for masses; that a headstone should be put up at the mother's grave and that the daughter should pay the dues, the court held that the daughter had such an equity that a new and subsequent certificate obtained shortly before the mother's death was null and void.

In *Maynard v. Vanderwerker,* 30 Abb. N. C. (N. Y.) 134, 24 N. Y. Supp. 932, the court held that where a niece became insured for the benefit of her aunt and the latter paid all the assessments and subsequently the niece married and changed the beneficiary to her husband, the first beneficiary "by virtue of the agreement with her niece before any certificate was taken out, and by reason of having furnished the money to pay the assessments thereon, had acquired a vested interest in the certificate, of which her niece was powerless to deprive her by procuring a new certificate to be issued, containing her husband's name as beneficiary."

The evidence of James F. Mudra, the oldest son, that when his father first gave the certificate to the mother, the father said, "Now mother, this is yours— you pay those premiums and you look after it that these premiums are paid," is strong evidence going to

show that it was understood in the family and specially between the husband and wife that the certificate was taken out solely for the benefit of the mother, and with the further understanding that she was to pay, or cause to be paid, the premiums, and although James F. Mudra stated on cross-examination that some of the money which his mother gave him to pay premiums came from money which the mother and father had accumulated during their married life, that does not necessarily conflict with the claim that the father took out the certificate for the benefit of the mother and with the agreement that she was to pay or cause to have paid the premiums. The certificate itself was given to her by her husband and was kept by her.

It is the evidence of the son Bohumil that, on one occasion before his father and mother went to Nebraska, his father told him to take care of the premiums because that was all his mother would ultimately have when he died, and that tends to confirm the testimony of James F. Mudra, the oldest son, that an agreement had actually been made that the certificate was for the mother and that she was to pay the premiums or to have them paid for her by her children. Further, the evidence of Bohumil, to the effect that he personally paid some of the premiums out of his own pocket on his mother's behalf and that, within 3 years, his father had stated that they could pay the premiums or let the policy lapse, tends to justify the conclusion that the certificate was taken out pursuant to an agreement that it was to be the wife's and that she was to see that all the premiums were paid. Also, the testimony of Antonie Mraz was in corroboration of that of the three sons. It is true that the secretary, Vranek, who knew the deceased, however, only after he joined plaintiff's lodge in 1915, stated that James Mudra (the deceased) in his lifetime occasionally paid his dues, but he also stated that he had seen

Rudolph pay his father's dues and that, on several occasions Rudolph had inquired, and also his brothers, "whether or not father's dues were paid."

Considering all the evidence, we are of the opinion that it sufficiently shows that the certificate, payable to Anna Mudra, was both taken out and given to her with the understanding between husband and wife and in the family that it was to belong to the wife and that she was to pay or cause to be paid the accruing premiums; and further, that substantially all the premiums for a period of about 16 years were paid by the wife Anna Mudra or by her sons on her behalf and, finding such to be the facts, we are of the opinion, as a matter of law, that Anna Mudra, the wife, had on March 13, 1916, when the second certificate was issued, such an equity and vested interest in the insurance represented by the certificate, that James Mudra, the deceased, was not entitled, without her consent, to change the beneficiary, and that, therefore, the second certificate was null and void.

In view of the foregoing, it becomes unnecessary to consider the claim made as to the alleged misrepresentations when the second certificate was issued and the claim as to the habits of the deceased and whether his mind became affected by drinking.

Finding no error in the record the judgment is affirmed.

*Affirmed.*

O'CONNOR and THOMSON, JJ., concur.